IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| David Royal Lee, | ) | C/A No. 0:15-3546-JFA-PJG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Town of Fort Mill; Police Officer Robert Giglio, *officially and individually*; Police Officer Royce Clack, *officially and individually*; | ) ) ) ) ) | |
| Defendants. | ) ) | |

The plaintiff, David Royal Lee, filed this civil rights action pursuant to 42 U.S.C. § 1983 against the defendants for their role in shooting the plaintiff's dog, "T," and the plaintiff's subsequent arrest. The plaintiff also asserted various state law claims.[1] This matter is before the court pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) (D.S.C.) for a Report and Recommendation on the defendants' motion for summary judgment (ECF No. 22). The plaintiff filed a response (ECF No. 27), and the defendants replied (ECF No. 29). Having reviewed the parties' submissions and the applicable law, the court concludes that the defendants are entitled to summary judgment on the plaintiff's federal constitutional claims and his state law claims should be remanded to state court.

---

[1] The defendants removed this action from the York County Court of Common Pleas on September 3, 2015.

Page 1 of 18



**BACKGROUND**

The following facts are either undisputed or are taken in the light most favorable to the plaintiff, to the extent they find support in the record. On July 1, 2013, Lee made a non-emergency call to the Fort Mill Police Department in reference to his neighbor's harassment of his girlfriend. (Lyon's Aff. ¶ 1, ECF No. 22-11 at 1; Marshall Dash Cam Video, Defs.' Mot. Summ. J., Ex. C, 4:15-4:40.) Officer James Lyons was dispatched to Lee's house to receive his complaint. (Lyons Aff. ¶ 1, ECF No. 22-11 at 1.) Defendant Officer Robert Giglio was riding in the passenger's seat of Officer Lyons's patrol car that day. (Id.) En route to Lee's house, the officers received a call from another officer warning them to turn on their dashboard camera and microphones because other officers had experienced problems at Lee's house before. (Giglio Dep., ECF No. 22-2 at 3.) Officer Lyons drove just past Lee's house because the street addresses were not visible from the road, so he parked on the street in front of the home of Lee's next-door neighbor. (Lyons Aff. ¶ 2, ECF No. 22-11 at 1; Giglio Dep., ECF No. 22-2 at 5-6.) As they passed Lee's house, Officer Giglio observed two large breed dogs in Lee's front yard that appeared to him to be pit bull mixes, and a woman later identified as Lee's girlfriend.[2] (Giglio Dep., ECF No. 22-2 at 7; Lyons Dash Cam Video, Defs.' Mot. Summ. J., Ex. B, 1:18-1:28.)

Officer Giglio exited the passenger's side of the patrol car, which was on the same side of the street as Lee's house, and closed the car door. (Giglio Dep., ECF No. 22-2 at 8.) Immediately thereafter, Giglio claims he heard Lee's dogs, turned around to look behind him, and saw the dogs were running toward him "aggressively" and "at full speed," with one dog ahead of the other by about

---

[2] In the recording from Lyons' dashboard camera video, upon seeing the dogs in Lee's yard, one of the officers remarked, "He needs to put his pit bulls away."



ten feet. (Id. at 9.) Officer Giglio, standing in the street in front of Lee's next-door neighbor's house, claims he had "about three seconds" to react, his back was to the patrol car, and he had no means of escape. (Id. at 9, 20.) He drew his service pistol and fired one shot at the lead dog that missed but caused it to stop running. (Id. at 9.) He fired a second round at the other dog because it had not stopped running toward him, but that shot also missed. (Id.) He fired a third shot because the dog was still running toward him. (Id.) The third shot hit the dog, later identified as T, and caused T to stop, crouch down, and stare at Officer Giglio. (Id.) Officer Giglio claimed that, initially, he was not aware that the third shot hit the dog. (Id.) With both dogs stopped, Officer Giglio then retreated behind the police car to distance himself from the dogs. (Id. at 10.) Both dogs ran back toward Lee's front porch but remained outside the house. (Giglio Dep., ECF No. 22-2 at 10, 12; Marshall Dash Cam Video, Defs.' Mot. Summ. J., Ex. C, 1:08-1:20.)

Officer Lyons corroborated Officer Giglio's account of the shooting, as he exited his patrol car faster than Officer Giglio and was standing at the back of the patrol car when the dogs ran towards Officer Giglio. (Lyons Aff. ¶¶ 3-4, ECF No. 22-11 at 1-2.) Another witness, Chris Potts,[3] claims he saw the dogs run toward the patrol car, "mouthing at one another as they approached." (Potts Aff., ECF No. 27-5 at 1.) Potts also claims that the patrol car door behind Officer Giglio was still open at the time. (Id.)

Lee was inside his home during the shooting and heard the shots. (Lee Dep., ECF No. 27-4 at 86-87.) Lee walked outside to the front of his house within a few seconds of the shooting and, upon realizing that T had been shot, became irate. (Lee Dep., ECF No. 27-4 at 86-87; Lyons Dash

---

[3] Potts's affidavit does not provide any information about himself, or any information concerning his location in relation to the shooting, what he was doing at the time, or why he was at the scene.



Cam Video, Defs.' Mot. Summ. J., Ex. B, 1:55-5:35; Lee Dep., ECF No. 27-4 at 86-87.) Lee screamed and yelled obscenities at the officers as he paced around the front yard. (Lyons Aff. ¶ 5, ECF No. 22-11 at 2; Giglio Dep., ECF No. 22-2 at 13; Lyons Dash Cam Video, Defs.' Mot. Summ. J., Ex. B, 1:55-5:35; Lee Dep., ECF No. 27-4 at 86-87.) T was bleeding from a bullet wound in his face. (Lee Dep., ECF No. 27-4 at 116.) The officers told Lee what happened and ordered him to put his dogs inside several times. (Lyons Dash Cam Video, Defs.' Mot. Summ. J., Ex. B, 2:42-5:35.) Thereafter, and upon Officer Marshall's arriving at the scene in his patrol car, Lee approached Officer Marshall's car and confronted him about the shooting while his dogs continued to run loose in the street. (Marshall Dash Cam Video, Defs.' Mot. Summ. J., Ex. C, 0:58-1:15). Defendant Officer Royce Clack thereafter arrived at the scene. (Clack Dep., ECF No. 22-5 at 3.)

Lee then placed T in the back of his Jeep to take him to a veterinarian's office. (Lyons Aff. ¶ 6, ECF No. 22-11 at 2; Lee Dep., ECF No. 27-4 at 117.) Lee backed out of his driveway, and once he was on the road he accelerated, causing his tires to squeal, and seeing that two police cars were in the roadway, he drove around them by driving into his neighbor's yard. (Marshall Dash Cam Video, Defs.' Mot. Summ. J., Ex. C, 3:05-3:28.) Upon observing Lee's driving, Officer Marshall ordered Officer Clack to chase Lee and pull him over for reckless driving. (Id.) Officer Clack caught up to Lee in roughly thirty seconds, and observed Lee perform an illegal U-turn in front of another car on a busy two-lane road that was divided by solid double yellow lines. (Clack Dash Cam Video, Defs.' Mot. Summ. J., Ex. E, 2:06 -2:20; Clack Dep., ECF No. 22-5 at 11-12.) He believed Lee's U-turn could have caused a collision. (Clack Dep., ECF No. 22-5 at 12.) Officer Clack turned his patrol car around to chase Lee and ordered him to pull over via his loud speaker. (Clack Dash

Cam Video, Defs.' Mot. Summ. J., Ex. E, 2:20-3:07; Clack Dep., ECF No. 22-5 at 20.) Lee continued driving for about thirty seconds in defiance of Officer Clack's order to pull over. (Id.)

When Lee pulled over, he jumped out of his Jeep without opening the door and yelled at Officer Clack that his dog had been shot, while pointing at the dog. (Clack Dash Cam Video, Defs.' Mot. Summ. J., Ex. E, 3:07-3:52.) Officer Clack ordered Lee to put his hands on his car, handcuffed him, and placed him the back of his patrol car. (Id.) Lee screamed, yelled, and attempted to kick out the window of the patrol car off and on for about twenty-five minutes. (Clack Dash Cam Video, Defs.' Mot. Summ. J., Ex. E, 3:50-28:25; Clack Dep., ECF No. 22-5 at 13, 38-41.) Officer Clack placed Lee under arrest for reckless driving. (Clack Dash Cam Video, Defs.' Mot. Summ. J., Ex. E, 28:25-28:45; Clack Dep., ECF No. 22-5 at 12-13.) Lee was taken to jail and charged with violating the York County dog at large ordinance, damage to Town of Fort Mill property, and public disorderly conduct.[4] (Lyons Aff. ¶ 8, ECF No. 22-11 at 2; Defs.' Mot. Summ. J., Ex. A, ECF No. 22-12 at 3; Clack Dash Cam Video, Defs.' Mot. Summ. J., Ex. E, 28:45-42:22.)

York County Animal Control and Lee's mother arrived to help care for T. (Linda Lee Aff.; ECF No. 27-8 at 1-2.) They transported T to an emergency animal clinic but, because of his extensive blood loss, Lee's mother authorized the clinic to euthanize T. (Id.)

Lee originally filed suit against the defendants in the York County Court of Common Pleas, stating federal claims pursuant to § 1983 for unreasonable seizure and false arrest and imprisonment, and state law claims of intentional infliction of emotional distress and gross negligence. The defendants removed this action and now move for summary judgment on all of Lee's claims.

---

[4] Lee pled guilty to violating the York County dog at large ordinance and damage to Town of Fort Mill property so that the charge of public disorderly conduct would be dismissed. (Lyons Aff. ¶ 9; Lee Dep., ECF No. 27-4 at 90.)



# DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate only if the moving party "shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A party may support or refute that a material fact is not disputed by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).  Rule 56 mandates entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In deciding whether there is a genuine issue of material fact, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 248.

The moving party has the burden of proving that summary judgment is appropriate.  Once the moving party makes this showing, however, the opposing party may not rest upon mere allegations or denials, but rather must, by affidavits or other means permitted by the Rule, set forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(c), (e); Celotex Corp., 477 U.S. at 322.

In determining whether summary judgment should be granted, "[t]he court 'must perform a dual inquiry into the *genuineness* and *materiality* of any purported factual issues.' " Drewitt v. Pratt, 999 F.2d 774, 778 (4th Cir. 1993) (quoting Ross v. Commc'ns Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985)).   " 'As to materiality, the substantive law will identify which facts are material[,]' " . . . "[w]hile '[g]enuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice.' " Id. (quoting Anderson, 477 U.S. at 248; Ross, 759 F.2d at 364).

### B.     Fourth Amendment Unreasonable Seizure Claim

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Privately owned dogs are "effects" subject to the protections of the Fourth Amendment, and the killing of a dog by a police officer constitutes a seizure of the dog owner's property. Altman v. City of High Point, 330 F.3d 194, 203-05 (4th Cir. 2003).

A claim that a law enforcement officer improperly seized a plaintiff's effects with force is properly analyzed under the reasonableness standard of the Fourth Amendment to the United States Constitution.  See id. at 205; Graham v. Connor, 490 U.S. 386, 394-95 (1989).   The Fourth Amendment test is an objective one; however, it is not capable of precise definition or mechanical application. Graham at 396-97.  It requires the court to determine "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397; see also Yates v. Terry, 817 F.3d 877, 884-85 (4th



Cir. 2016); Yarborough v. Montgomery, 554 F. Supp. 2d 611, 617 (D.S.C. 2008).  The court must balance " 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the importance of the governmental interest alleged to justify the intrusion." Yarborough, 554 F. Supp. 2d at 617 (quoting Graham, 490 U.S. at 396); see also Yates, 817 F.3d at 884-85.

Courts must examine the totality of the circumstances in determining whether the force used was objectively reasonable.  Yates, 817 F.3d at 885.  "The Supreme Court has admonished that '[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.' " Altman, 330 F.3d at 205 (quoting Graham, 490 U.S. at 396-97) (alteration in original).  "[I]n judging the reasonableness of the officers' actions, we assess only the reasonableness of their actions vis-a-vis the dogs; we do not consider potential harm to third parties." Id.  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396.

In the case at bar, Officer Giglio argues the facts taken in the light most favorable to Lee fail to show his shooting of T constituted an unreasonable seizure in violation of the Fourth Amendment. The court agrees.  Particularly instructive in this case is the decision of the United States Court of Appeals for the Fourth Circuit in Altman.  In Altman, the Fourth Circuit found that the killing of dogs in four separate incidents by animal control officers of the City of High Point was objectively reasonable under the Fourth Amendment.  Altman, 330 F.3d at 205.  Discussing the competing public and private interests involved in the reasonableness standard explained in Graham, the Court stated:

PJG

> On the one hand, the public interests in this case are significant. The state of North Carolina and the City of High Point have a substantial interest in protecting their citizens from all the dangers and nuisances associated with dogs. Dogs may harass or attack people, livestock, or other pets. Dogs can maim or even kill. Dogs may also spread disease or cause property damage. On the other hand, the private Fourth Amendment interests involved are appreciable. Dogs have aptly been labeled "Man's Best Friend," and certainly the bond between a dog owner and his pet can be strong and enduring. Many consider dogs to be their most prized personal possessions, and still others think of dogs solely in terms of an emotional relationship, rather than a property relationship.
>
> The case before us does not present both interests at their zenith, however. When a dog leaves the control of his owner and runs at large in a public space, the government interest in controlling the animal and preventing the evils mentioned above waxes dramatically, while the private interest correspondingly wanes. Put simply, while we do not denigrate the possessory interest a dog owner has in his pet, we do conclude that dog owners forfeit many of these possessory interests when they allow their dogs to run at large, unleashed, uncontrolled, and unsupervised, for at that point the dog ceases to become simply a personal effect and takes on the nature of a public nuisance. This understanding is reflected in High Point Ordinance § 12-2-16, which provides that when a dog is running at large it may be tranquilized or even killed if it cannot be safely taken up and impounded.

Id. at 205-06. In finding that the animal control officers' killings of the dogs were justified under the Fourth Amendment, the Court heavily emphasized the heightened public interest in public safety when a dog is "running at large." Id. at 207. Further, in each incident, the animal control officers observed, or were made aware of, an instance of the dog's aggressive behavior prior to killing it. Id. at 206-07.

In the case at bar, it is undisputed that Lee's dogs were unleashed and not under the immediate control of their owner. But in a significant difference from the incidents in Altman, Lee's dogs were on their owner's property when they started running toward Officer Giglio, rather than running in a purely public space. On the other hand, Officer Giglio was standing on a public street in front of Lee's neighbor's house, and Lee's dogs were running directly toward Officer Giglio. The

fact that Lee's dogs were unleashed, not under Lee's or his girlfriend's immediate control, and running toward a law enforcement officer standing in a public street, heightened the City of Fort Mill's interest in protecting its officer or the public from the unrestrained dogs and, correspondingly, lessened Lee's private interest in protecting his dogs from unreasonable seizure.

Further heightening the City of Fort Mill's interest in protecting its officer or the public, beyond the fact that Lee's dogs were unrestrained, is the size of the dogs, breed, number, and manner in which they approached Officer Giglio. Officer Giglio described the dogs as "a large breed" that appeared to be pit bull mixes.[5] (Giglio Dep., ECF No. 22-2 at 7.) See Altman, 330 F.3d at 206 (considering the size and breed of dog in determining whether an animal control officer's killing of a dog running at large was objectively reasonable, and also finding that pit bulls are a dangerous breed).[6] Officer Giglio did not see the dogs until he stepped out of the patrol car and, because the

---

[5] The court notes that the actual breed of Lee's dog is disputed. Lee estimated T weighed eighty pounds, and described both dogs as large breeds. (Lee Dep., ECF No. 22-8 at 9.) He stated T was a boxer mix and the other dog, T's sire, was a pure breed boxer. (Id.) Veterinarian records and separate York County Animal Control records submitted with the defendants' memorandum in support of summary judgment both list T's breed as a boxer-pit bull mix. (Defs.' Mot. Summ. J., Ex. F, ECF No. 22-7 at 3-4; Defs.' Mot. Summ. J., Ex. H, ECF No. 22-9 at 2.) However, for purposes of the reasonableness analysis, the officer's reasonable perception of the breed is controlling because the officer cannot be expected to make a split-second judgment about the breed of a dog in an evolving situation. See Branson v. Price, Civil Action No. 13-cv-03090, 2015 WL 5562174, at *6 (D. Col. 2015) (considering the officer's reasonable perception of the dangerousness of the breed of dog in determining whether seizing the dog was justified); see also Waterman v. Batton, 393 F.3d 471, 478 (4th Cir. 2005) (citing Graham, 490 U.S. at 396-97) ("Of course, the critical reality here is that the officers did not have even a moment to pause and ponder these many conflicting factors."). The court finds that Officer Giglio's perception that the dogs were pit bulls was reasonable based on T's veterinarian records, animal control records, the fact that multiple officers who responded to the scene of T's shooting described the dogs as pit bulls.

[6] Other courts beside the Fourth Circuit have concluded that pit bulls are a dangerous breed of dog because of their unpredictability and ability to harm humans. See e.g. Niesen v. Garcia, Civ. No. 2:14-2921 WBS CKD, 2016 WL 4126382, at *9 (E.D. Cal. 2016) (finding that the officers who killed the plaintiff's pit bulls were "dealing with a breed of dog that is known for fighting, aggressive



patrol car had driven past Lee's house, turned to look behind him. (Giglio Dep., ECF No. 22-2 at 8.) He stated the dogs "came around a bush *aggressively at full speed*." (Id.) (emphasis added). Officer Giglio estimated he had about three seconds to react, his back was to the patrol car, and he had no means of escape. (Id. at 9); see Altman, 330 F.3d at 206 (finding an animal control officer was entitled to shoot a pack of dogs in self-defense when the pack charged him, stating that "the danger presented by a dog increases significantly when that dog joins others in a pack"). Accordingly, the size, number, breed, and speed of Lee's dogs further tips the balance in favor of the City of Fort Mill's interest in protecting its law enforcement officers and citizens over Lee's private interest in protecting his dogs against seizures by the government.

Given the totality of the circumstances confronting Officer Giglio—the size and breed of the dogs, the speed at which they approached him, the fact that they were unrestrained, the fact he was standing on a public street, and the significant public interest in ensuring the safety of law enforcement officers—no reasonable jury could find that Officer Giglio's perception of danger was objectively unreasonable. In such a situation, the government's interest in the officer's safety outweighs Lee's private interest in protecting his dogs from seizure by the government. See Stephenson v. McClelland, 632 F. App'x 177, 185 (5th Cir. 2015) (finding a police officer who shot the plaintiff's dog in self defense was entitled to qualified immunity) (citing Grant v. City of Houston, 625 F. App'x 670, 676 (5th Cir. 2015); Bailey v. Schmidt, 239 F. App'x 306, 308 (8th Cir.

---

behavior, and causing serious injury. These general characteristics made the belief that this breed of dog is more likely to attack and was about to attack even more reasonable."); Warboys v. Proulx, 303 F. Supp.2d 111, n.13 (D. Conn. 2004); Vanater v. Vill. of S. Point, 717 F. Supp. 1236, 1243 (S.D. Ohio 1989) (finding a town ordinance banning pit bulls was supported by evidence of pit bulls' inherent characteristics of "exceptional aggression, athleticism, strength, viciousness and unpredictability").



2007) (finding officers were entitled to use force against dogs that "either advanced on or acted aggressively toward the officers"); Altman, 330 F.3d at 206 (finding an animal control officer was entitled to shoot dogs in self defense where a pack of five dogs charged him after he exited his car and the officer already knew the dogs were aggressive and dangerous); Brown v. Muhlenberg Twp., 269 F.3d 205, 210-11 (3d Cir. 2001) (providing that the state's interest in protecting life and property may justify the destruction of the pet in the owner's presence where there is reason to believe the pet poses an imminent danger); but see Criscuolo v. Grant Cty., 540 F. App'x 562, 564 (9th Cir. 2013) ("It is clearly established that it is unreasonable to shoot an unleashed dog—even if it surprises an officer on public property—if it poses no imminent or obvious threat, its owner is in close proximity and desirous of obtaining custody, and deadly force is avoidable."). Moreover, the government's interest in officer safety has been found to outweigh the interests of dog owners where an unleashed dog charges an law enforcement officer in factual scenarios similar to the case at hand. See e.g. Romero v. Bexar Cty., 993 F. Supp.2d 658, 661-62 (W.D. Tex. Jan. 9, 2014) (providing it is objectively reasonable for an officer to shoot a dog that he reasonably believes poses a threat where officers responding to a 9-1-1 call entered the plaintiff's fenced-in property and shot one of four of the plaintiff's dogs that charged them); Esterson v. Broward, No. 09-60280-CIV, 2010 WL 4614725, at *4 (S.D. Fla. 2010) (finding that officer acted reasonably in shooting an eighty pound dalmatian that barked at her and charged her from the plaintiff's home, where the officer was responding to a non-emergency call, walking toward the rear of the plaintiff's home, and had no means of retreat); Warboys v. Proulx, 303 F. Supp.2d 111 (D. Conn. 2004) (finding an officer involved in searching for a fleeing suspect, who shot a charging ninety-to-one-hundred-pound pit bull, acted reasonably to protect himself and his police tracking dog). Accordingly, no reasonable jury could find that

PJG

Officer Giglio was not justified in shooting T, and that this seizure was unreasonable under the Fourth Amendment.

Lee argues that genuine issues of material fact preclude summary judgment for Officer Giglio, namely, that a witness to the incident, Chris Potts, observed the dogs running toward Officer Giglio "mouthing at one another as they approached." Lee argues that if the dogs were "mouthing" as Potts described, it would show the dogs were not running up to Officer Giglio in an aggressive manner.[7] However, this fact, even taken in the light most favorable to Lee, does not preclude summary judgment. Even if the dogs were mouthing at each other, an officer in this situation could reasonably and objectively believe that the dogs, who were running at him at full speed, were aggressive and meant him harm. See Stephenson, 632 F. App'x at 185 (finding that an officer who was startled by a large dog that was showing its teeth, whether baring them aggressively or "smiling" as the plaintiff argued, acted reasonably in shooting the dog to protect himself). That Lee's dogs may have been "mouthing" at each other may have even made it more likely that a reasonable officer would fear for his safety because mouthing may expose the dogs' teeth, indicating aggression rather than passivity or friendliness. The law does not require officers to read the body language of dogs they are unfamiliar with in a manner of seconds while multiple dogs charge them. See Stephenson, 632 F. App'x at 185 ("While [the plaintiff] knew his family pet to be friendly and nonaggressive, [the defendant officer] did not. . . . [The officer] was forced to make a split-second judgment in a tense situation and he acted to protect himself."); see also Graham, 490 U.S. at 396-97 ("The

---

[7] In the context of animals, especially dogs, the Oxford English Dictionary defines "mouthing" as "[t]ake in or touch with the mouth," as in, "puppies may mouth each other's collars during play." *Mouth*, The Oxford English Dictionary, https://en.oxforddictionaries.com/definition/mouth.



calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.").

Lee also argues that Officer Giglio had a duty to use "less restrictive means" of subduing T before shooting him. While there is support for such a standard in the United States Court of Appeals for the Ninth Circuit, the case at bar is distinguishable. In San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose, 402 F.3d 962 (9th Cir. 2005), the Ninth Circuit stated the Fourth Amendment forbids the killing of a person's dog when that destruction is unnecessary—that is, when less intrusive, or less destructive, alternatives exist. Id. at 978 ("A reasonable officer should have known that to create a plan to enter the perimeter of a person's property, knowing all the while about the presence of dogs on the property, without considering a method for subduing the dogs besides killing them, would violate the Fourth Amendment."). However, the officers in Hells Angels spent one week planning their entry of the plaintiff's home pursuant to a warrant, and were aware the plaintiff had guard dogs that would meet them at the gates of plaintiff's home. Therefore, the Ninth Circuit found the officers could not use safety as a justification for shooting the plaintiff's dogs in light of the fact that they had time to prepare a less intrusive means of protecting themselves from the plaintiff's dogs. Id. at 977 ("While the governmental interest of safety might have provided a sound justification for the intrusion had the officers been surprised by the presence of the dogs, the same reasoning is less convincing given the undisputed fact that the officers knew about the dogs a week before they served the search warrants. The officers had substantial time to develop strategies for immobilizing the dogs.") In contrast, Officer Giglio was not aware that Lee had dogs until he drove up to Lee's house, and he had no reason to think the dogs would charge him upon

exiting the patrol car. Accordingly, Officer Giglio's failure to use less intrusive means to protect himself from Lee's dogs does not, under the facts presented, render the seizure objectively unreasonable.

Because Officer Giglio did not commit an unreasonable seizure of Lee's dog in violation of the Fourth Amendment, summary judgment should be granted in Officer Giglio's favor.[8]

**C.     False Arrest and False Imprisonment**

To establish a § 1983 claim based on a Fourth Amendment violation for false arrest, false imprisonment, or malicious prosecution a plaintiff must show that the seizure was effected without probable cause. See Massey v. Ojaniit, 759 F.3d 343, 356 (4th Cir. 2014); Brown v. Gilmore, 278 F.3d 362, 367 (4th Cir. 2002); Rogers v. Pendleton, 249 F.3d 279, 294 (4th Cir. 2001); Brooks v. City of Winston-Salem, 85 F.3d 178, 183 (4th Cir. 1996). Thus, there is no § 1983 claim for false arrest, false imprisonment or malicious prosecution unless the officer lacked probable cause. See Street v. Surdyka, 492 F.2d 368, 372-73 (4th Cir. 1974). "Probable cause to justify an arrest arises when 'facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" Porterfield v. Lott, 156 F.3d 563, 569 (4th Cir. 1998) (quoting Michigan v. DeFillippo, 443 U.S. 31, 37 (1979)). It requires more than bare suspicion, but less than evidence necessary to convict, Porterfield, 156 F.3d at 569, and the determination of whether probable cause exists is reviewed under the totality of the circumstances. See Illinois v. Gates, 462 U.S. 213, 238 (1983); Taylor v. Waters, 81 F.3d 429, 434 (4th Cir. 1996).

---

[8] Lee does not specify that he is only pursuing his unreasonable seizure claim against Officer Giglio. However, Lee has not provided any facts or argument in support of finding that the other defendants participated in an unreasonable seizure of Lee's dog.



The defendants argue that an objectively reasonable law enforcement officer would conclude there was probable cause to believe that Lee drove recklessly, in violation of state law. The court agrees. Officer Clack arrested Lee for reckless driving. See S.C. Code Ann. § 56-5-2920 ("Any person who drives any vehicle in such a manner as to indicate either a wilful or wanton disregard for the safety of persons or property is guilty of reckless driving."). By the time Officer Clack began to pursue Lee on the highway and ordered him to pull over, he and other officers observed Lee accelerate and squeal his tires after backing out of his driveway, drive through a neighbor's yard to avoid cars parked in the roadway, and perform a U-turn in front of an oncoming car on a busy two-lane highway. Moreover, once Officer Clack turned on his blue lights and siren and ordered Lee to pull over to the side of the road, Lee ignored the officers' commands and continued driving for about thirty seconds. At a minimum, Lee's detour into his neighbor's yard and U-turn was sufficient to show that his erratic driving could place people or property in danger. Therefore, Officer Clack had probable cause to detain him initially and later arrest him for reckless driving. See Brown, 278 F.3d at 367 ("For probable cause to exist, there need only be enough evidence to warrant the belief of a reasonable officer that an offense has been or is being committed; evidence sufficient to convict is not required."). Because Officer Clack had probable cause to arrest Lee for reckless driving, summary judgment should be granted in Officer Clack's favor.[9]

**RECOMMENDATION**

For the foregoing reasons, the court concludes that the plaintiff's federal claims fail as a matter of law. Accordingly, the court recommends the defendants' motion for summary judgment

---

[9] Lee does not specify that he is only pursuing his false arrest and imprisonment claim against Officer Clack. However, Lee has not provided any facts or argument in support of finding the other defendants participated in Lee's arrest and imprisonment.



be granted as to the federal claims. Additionally, in light of the court's recommendation, the court should decline to exercise supplemental jurisdiction over Lee's state law claims, which should be remanded pursuant to 28 U.S.C. § 1367(c).

> _____
> Paige J. Gossett
> UNITED STATES MAGISTRATE JUDGE

September 30, 2016
Columbia, South Carolina

*The parties' attention is directed to the important notice on the next page.*

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.' " Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

> Robin L. Blume, Clerk
> United States District Court
> 901 Richland Street
> Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).